# UNITED STATES DISTRICT COURT
for the

Eastern District of North Carolina



In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

202 Treybrooke Drive, Morrisville, NC,
Office of Nevine Elshiekh
and computer related items

) 
) Case No. 7:12- mj-1010
)
)
)
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: 202 Treybrooke Drive, Morrisville, NC, the office of Nevine Elshiekh, further described in attachment A, and computer related items.

located in the _____ **Eastern** _____ District of _____ **North Carolina** _____ , there is now concealed *(identify the person or describe the property to be seized)*: items more fully described in Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of a crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section: | Offense Description: |
|---|---|
| 18 U.S.C. 1958 | Use of interstate commerce facilities in the commission of a murder-for-hire. |

The application is based on these facts:
See attached affidavit of Special Agent Julia Schulte Hanish

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Julia Schulte Hanish, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/20/2012

_____
*Judge's signature*

City and state: _____ Wilmington, North Carolina

ROBERT B. JONES JR. US Magistrate Judge
*Printed name and title*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

IN THE MATTER OF THE )
SEARCH OF: )
                 ) CASE No. __7:12-mj-1010__
202 Treybrooke Drive )
Office of NEVINE ELSHIEKH )
MORRISVILLE, NORTH CAROLINA )

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Julia Schulte Hanish, your Affiant, being duly sworn, do hereby affirm and state the following.

## INTRODUCTION

1. I have been a Special Agent with the Federal Bureau of Investigation (FBI) since 2004 and am currently assigned to the Charlotte Division. During the course of my career, I have served in three FBI Field Divisions, including the Charlotte Division, and have conducted or assisted with criminal investigations in almost all of the FBI's investigative programs to include the White Collar Crime program. I have been the affiant on and assisted in previous search warrants related to document and computer searches. Since my arrival in the Charlotte Division in April 2011, I have been assigned to the Joint Terrorism Task Force (JTTF) located in Raleigh, North Carolina.

2. As a federal agent, your Affiant is authorized to

1

investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

## BACKGROUND

3. The statements in this affidavit are based in part on information provided by Special Agents of the FBI, other law enforcement officials including investigators from the New Hanover County Sheriff's Office (NHCSO), and the Bureau of Alcohol Tobacco Firearms and Explosives (BATFE), information provided by cooperating witnesses, and on my experiences and background as a law enforcement officer.

4. This affidavit is submitted in support of an application for a warrant to search the office of NEVINE ELSHIEKH located at the STERLING MONTESSORI ACADEMY, **202 TREYBROOKE DRIVE, MORRISVILLE, NORTH CAROLINA**, more particularly described in Attachment A, including any records, notes, photographs, computers and computer media, including cellular telephones, located therein where the instrumentalities, fruits and evidence of violations of Title 18, United States Code, Section 1958, as specified further in Attachment B, might be found.

5. Since this affidavit is being submitted for the

2

limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, contraband, fruits, and instrumentalities of violations of Title 18, U.S.C., § 1958, will be found at the office of NEVINE ELSHIEKH located at the STERLING MONTESSORI ACADEMY, **202 TREYBROOKE DRIVE, MORRISVILLE, NORTH CAROLINA**.

### STATUTORY AUTHORITY

6.  This investigation concerns alleged violations of 18 U.S.C. §§ 1958, relating to the use of interstate commerce facilities in the commission of a conspiracy to commit murder-for-hire.

> a.  18 U.S.C. §§ 1958, generally, makes it a violation to travel in or cause another to travel in interstate or uses or causes another to use the mail or any facility of interstate commerce, with the intent that a murder be committed in violation of the laws of North Carolina or the United States as a consideration for the receipt of, or as consideration for a promise or agreement to pay anything of pecuniary value, or who conspires to do

3

so.

## <u>DEFINITIONS</u>

7.  The following definitions apply to this Affidavit and Attachment B:

    a.  "Computer" refers to an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, including cellular telephones, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

    b.  "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units; internal and peripheral storage devices such as internal, removable, and external hard drives; floppy disk drives and diskettes; optical disk drives, compact disks (CDs) and digital video disks (DVDs); USB flash drives;

4

and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

c.  "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to

5

make it inaccessible or unusable, as well as reverse the progress to restore it.

d. "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

e. "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

f. "Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital

6

subscriber line (DSL) or coaxial cable, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password. ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed

7

Case 7:12-mj-01010-RJ    Document 1    Filed 01/23/12    Page 8 of 31

record format.

g.  "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

h.  "Records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as cellular phones, floppy

8

diskettes, hard disks, compact disks (CDs), digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic

## COMPUTERS

As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until

9

overwritten by other data.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

8.     Based on your Affiant's knowledge, training and experience, and the experience of other law enforcement personnel, your Affiant knows that searches and seizures of evidence from computers commonly require agents to seize most or all computer items (hardware, software and instructions), to be processed later by a qualified computer expert in a laboratory or other controlled environment.  The reasons why this is true are set forth below in paragraphs.

9.     Computer storage devices (such as hard disks, CDs and DVDs, flash storage devices, diskettes, tapes, laser disks, etc.) can store the equivalent of thousands of pages of information.  When the user wants to conceal evidence of a crime, he or she might store it in random order with deceptive file names.  This requires the searching investigators to examine all the stored data to determine whether it is included on the warrant.  This sorting process can take weeks or months, depending on the amount of data stored, and it would be impractical to attempt this kind of data search on site at the time the search warrant is executed.

10.     Searching computer systems for criminal evidence is a

10

Case 7:12-mj-01010-RJ    Document 1    Filed 01/23/12    Page 11 of 31

highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources and from a destructive code embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

11. In order to fully retrieve data from a computer system, the analyst needs all data storage devices, as well as the central processing unit (CPU). In cases where the evidence consists partly of graphics files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create or display the data (whether stored on hard drives or on external media)

11

12. In addition, the computer and its storage devices, including cellular telephones, the monitor, keyboard and modem, are all instrumentalities used in the murder for hire conspiracy and retaliation against a witness, in violations of Title 18, United States Codes, § 1958, and should be seized as such.

## SEARCH METHODOLOGY TO BE EMPLOYED

13. The search procedure of electronic data contained in computer hardware, computer software, cellular telephones and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

    a. examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

    b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data

12

is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c. surveying various file directories and the individual files they contain;

d. opening files in order to determine their contents;

e. scanning storage areas;

f. performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment-A; and/or

g. Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment-B.

### BACKGROUND OF THE INVESTIGATION

14. Based on your Affiant's knowledge and experience and on information received from other individuals, including law enforcement officers as set forth below, your Affiant has learned the following:

13

15. As background, on or about October 13, 2011, HYSEN SHERIFI (SHERIFI) was convicted by a jury in federal court for violation of Title 18, United States Code (USC) Section 2339(a) (Providing Material Support to Terrorists), Title 18, USC, Section 956 (Conspiracy to Murder, Kidnap and Injure Persons Abroad), Title 18, USC, Section 1117 (Conspiracy to Murder United States Military Personnel) and Title 18, USC, Section 924(c) (Possession of a Firearm in Furtherance of a Crime of Violence). The conviction was a result of a six year Counterterrorism Investigation conducted by the Raleigh office of the FBI into a group of individuals suspected of promoting radical Islamic ideology and promoting and conducting violence here and abroad. In particular, the group conducted paramilitary training and conspired to attack United States military service members and their families at the Marine Corp Base located at Quantico, Virginia. As a result of his conviction, SHERIFI is currently incarcerated as a federal inmate in the New Hanover County Detention Facility (NHCDF) located at 3950 Juvenile Center Drive, Castle Hayne, North Carolina. SHERIFI arrived at NHCDF on or about October 13, 2011.

## Confidential Source One

14

16. In the course of this investigation, an individual was developed as a confidential source hereinafter referred to as confidential source one (CS-1). CS-1 has provided information to law enforcement in the past which has resulted in the arrest of individuals and the seizure of a firearm and controlled substances. Law enforcement officers have found CS-1's information to be credible in the past. The information provided by CS-1, which is contained in this affidavit, has been corroborated through independent law enforcement investigation.

17. CS-1 has previously provided information to the affiant, which resulted in the issuance of a search warrant on December 13, 2011 in the Eastern District of North Carolina. The search warrant authorized the opening of a sealed letter. The letter was provided to CS-1 by SHERIFI for the purpose of smuggling it out of the jail. Assertions made by SHERIFI to CS-1 were used to help establish probable cause to open the letter. Upon opening the letter, nothing of a criminal nature was detected by law enforcement and SHERIFI's statements, as told to CS-1 were found to be inaccurate. Since the contents of the letter contained no evidence of a crime, the letter was resealed and sent on its way. It is the affiant's belief that delivery of this letter was a means by SHERIFI to determine if CS-1 was working at the request of law enforcement.

15

18. In November, 2011 CS-1 contacted the FBI to advise that SHERIFI had confided in him/her and requested his/her assistance for the purpose of hiring someone to kill several individuals. Three of the intended victims are witnesses who testified against him at his federal trial. Another intended victim is another inmate who defrauded SHERIFI out of money. Of the intended victims, two reside outside the state of North Carolina. During the course of this investigation, SHERIFI has identified the individuals to CS-1.

19. Based on this investigation your affiant is aware SHERIFI believes that at least one of the targets is outside the state of North Carolina.

20. In an effort to obtain further information from SHERIFI, CS-1 agreed to assist him and identified an associate who would kill these individuals for payment. CS-1 has done this with the complete knowledge of your affiant.

21. During the course of this investigation, CS-1 has advised that SHERIFI has promised to pay for the murder and beheading of the individuals who testified against SHERIFI at his federal trial.

22. Your affiant has reviewed recordings in which SHERIFI further told CS-1 he wants photographs taken, and provided too him, of the dead bodies and severed heads. He further told CS-1

16

that he wants the heads and bodies disposed of. SHERIFI explained he wants the witnesses to completely disappear so they cannot testify against him, and others, at any future trials. SHERIFI also told CS-1 he may use the photographs of the dead bodies and severed heads to convince other potential witnesses not to testify against him, or his co-conspirators, at future proceedings.

23. On December 21, 2011, NEVINE ELSHIEKH (ELSHIEKH) visited SHERIFI at the NHCDF. ELSHIEKH was identified by the affiant through surveillance of a silver 2004 silver VOLVO XC90, NC License Plate XRB-8690, registered to NEVINE ALY ELSHIEKH at 3315 EDGEMONT DRIVE, RALEIGH, NORTH CAROLINA, upon its arrival to NHCDF. Affiant further observed ELSHIEKH leaving NHCDF and identified her from her drivers license photograph. The audio of that visit was monitored and recorded by agents of the FBI.

During the course of this visit, SHERIFI asked ELSHIEKH to write down some information to pass on to another individual. Your affiant is familiar with SHERIFI's voice through investigation and identified the male as SHERIFI. SHERIFI did not verbally tell ELSHIEKH the information but passed it to her visibly in the form of written notes. Upon writing down the information obtained from SHERIFI, ELSHEIKH was overheard repeating a specific address identified as being

17

related to one of the individuals who testified at SHERIFI's federal trial.

## Confidential Source Two

25. During the course of this investigation, another individual was developed as a confidential source hereinafter referred to as confidential source two (CS-2). The CS-2 has provided information to members of the FBI during the course of the investigation which has been corroborated through independent law enforcement investigation.

26. On December 21, 2011 at approximately 3:56 pm, CS-2 placed a telephone call in response to a voicemail to 919-793-3800. Based upon review of recorded jail conversations between SHERIFI and 919-793-3800, and also through non-legal correspondence between SHERIFI and ELSHIEKH, this number was identified as being used by ELSHIEKH. A female answered identifying herself as SHERIFI's friend. Your affiant is familiar with ELSHIEKH's voice through this investigation and knows the voice on the phone to be ELSHIEKH. ELSHIEKH told CS-2 she had three addresses that SHERIFI wanted her to give to CS-2. The female then provided CS-2 the names addresses of three individuals. Based upon a review of the names and addresses provided by ELSHIEKH, your affiant knows these to be the names and addresses associated with the victims.

18

27. On December 22, 2011, during a recorded jail call at NHCDF, ELSHIEKH told SHERIFI she was at work scanning documents related to his case. During another call on the same day SHERIFI asks ELSHIEKH to search on Twitter to determine if some of those guys are on Twitter. Your affiant is aware that "Twitter" is an on-line social networking service which can be accessed via a computer and/or cellular telephone.

28. A review of non-legal mail for SHERIFI at the NHCDF found a letter postmarked December 27, 2011 addressed to HYSEN SHERIFI with the return address, "NEVINE, 3315 Edgemont Dr., Raleigh, NC 27612." The contents of the envelope included a photocopy of a Twitter page which did match the name of one of the individuals targeted.

29. On January 2, 2012, an agent of the FBI provided a photograph of one of the intended victims to CS-2. This photograph was taken by agents of the FBI several days earlier. CS-2 provided this photograph to ELSHIEKH pursuant to the instructions of SHERIFI on January 2, 2012.

30. Law enforcement surveillance has established that ELSHIEKH uses 2004 silver Volvo XC90, bearing North Carolina registration XRB-8690 to drive to and from visits with SHERIFI. This 2004 Volvo XC90 was also used by ELSHIEKH when she met with CS-2 to obtain the photograph.

19

31. On January 2, 2012, previous to ELSHIEKH meeting with CS-2, ELSHIEKH was observed meeting with SHKUMBIN SHERIFI (who your affiant is aware is the brother of SHERIFI) who arrived in white 1995 Acura Integra, bearing North Carolina registration RRE-5788, registered to RESHAT SHERIFI, the father of SHERIFI and SHKUMBIN SHERIFI. Based upon surveillance SHKUMBIN SHERIFI has been observed in the vehicle on more than 5 occasions, no other individuals have been observed driving the vehicle.

32. Based on a review by your affiant of an audio recording, ELSHIEKH met SHERIFI at the NHCDF on January 2, 2012. Based upon review of this conversation your affiant knows the voices to be SHERIFI and ELSHIEKH. Based upon surveillance, ELSHIEKH was observed entering the NHCDF carrying a notebook. During the visit, SHERIFI asked ELSHIEKH if she met CS-2 and whether she got "them." ELSHIEKH acknowledged that she had but there was only one. Based upon the investigation and your affiant knowledge's of the case, this refers to a photograph of one of the intended victims. SHERIFI requested to see it. SHERIFI continued to ask questions which ELSHIEKH refused to answer verbally. ELSHIEKH then began writing notes to SHERIFI which she asked him if he could read. Based upon information and belief ELSHIEKH left with the photograph and has not returned it to CS-2.

20

33. On January 2, 2012 at approximately 2:31 pm, CS-2 met again with ELSHIEKH in the same vehicle she was seen operating previously. CS-2 asked ELSHIEKH if SHERIFI confirmed that it was the right person. ELSHIEKH responded "yeah" but then indicated that she did not want to speak. ELSHIEKH then wrote a note in CS-2's presence which read, "Pic Confirmed." On the other side of the paper ELSHIEKH wrote, "His brother is coming Saturday with rest." ELSHIEKH also gave CS-2 an envelope containing $750.00 in United States currency. CS-2 counted the money in ELSHIEKH's presence. Upon departing, ELSHIEKH identified herself to CS-2 as "Nevine." The entire meeting was audio and video recorded.

34. On January 3, 2012, during a recorded jail call at the NHCDF, a voice identified by affiant to be ELSHIEKH tells SHERIFI that "Beme" (your affiant is aware based on investigation Beme is SHKUMBIN SHERIFI) came to her work today and she scanned everything into her computer. ELSHIEKH also tells SHERIFI that Beme, SHKUMBIN SHERIFI, texts her.

35. Between on or about January 2, 2012 through January 10, 2012, ELSHIEKH tells SHERIFI during recorded jail calls at NHCDF that she is in telephone contact with SHKUMBIN SHERIFI and in contact with him via text.

21

36. On January 7, 2012, ELSHIEKH tells SHERIFI during a recorded jail call at the NHCDF that she went to his home, 7833 FOXWOOD DRIVE, RALEIGH, NORTH CAROLINA, to put money into the mailbox for SHKUMBIN SHERIFI. ELSHIEKH told SHERIFI, "what I put in the mailbox brings it up to 900." Surveillance observed ELSHIEKH in her previously mentioned vehicle on January 7, 2012, driving to 7833 FOXWOOD DRIVE, RALEIGH, NORTH CAROLINA, stopping briefly and turning around.

37. During multiple recorded jail conversations with SHERIFI by both ELSKIEKH and SHKUMBIN SHERIFI on January 7, 2012, they discuss selling items at either pawnshops or the mall. During one call SHERIFI and ELSHIEKH discuss SHKUMBIN SHERIFI going to the mall to sell items.

38. On January 8, 2012, surveillance observed SHKUMBIN SHERIFI arriving at the NHCDF at approximately 12:42 pm for a scheduled 1:00 pm visit with his brother, SHERIFI. The visit was monitored and recorded by agents of the FBI. SHKUMBIN SHERIFI departed the NHCDF at approximately 2:28 pm.

39. On January 8, 2012 at approximately 2:42 pm, CS-2 met with SHKUMBIN SHERIFI. The entire meeting was observed and documented by agents of the FBI. During the course of the meeting, SHKUMBIN SHERIFI gave CS-2 $4,250.00 in United States currency. He acknowledged to CS-2 he was aware of the fact that

22

NEVINE already gave the CS-2 $750.00 bringing the total to $5,000.00. After counting the money, CS-2 confirmed to SHKUMBIN SHERIFI that the total amount was $5,000.00.

40. On January 9, 2012, during a recorded jail call at the NHCDF, ELSHIEKH told SHERIFI she is at her office at work. ELSHIEKH tells SHERIFI she is making a binder of information related to him that was in her backpack.

41. ELSHIEKH and her vehicle, 2004 silver VOLVO XC90, NC License Plate XRB8690, have been observed on numerous occasions between December 27, 2011 through January 14, 2012, at ELSHIEKH's work, the **STERLING MONTESSORI ACADEMY, 202 TREYBROOKE DRIVE, MORRISVILLE, North Carolina.** STERLING MONTESSORI ACADEMY is located at the corner of Treybrooke Drive and Town Hall Drive in Morrisville, North Carolina. Per the classroom map on the STERLING MONETSSORI website, NEVINE ELSHIEKH's office is located in the C-Building between rooms C-12 and C-14. Per the staff listing on the STERLING MONETSSORI website, NEVINE ELSHIEKH's office is located in room C-13.

<u>CONCLUSION</u>

42. Based on the aforementioned information, your Affiant respectfully submits that there is probable cause to believe that violations of Title 18 U.S.C. §§ 1958 have been committed and that evidence of these crimes is currently located at the

23

office of NEVINE ELSHIEKH located at the STERLING MONTESSORI

ACADEMY, **202 TREYBROOKE DRIVE, MORRISVILLE, NORTH CAROLINA**,

which is described above and in Attachment A of this affidavit.

This evidence, listed in Attachment B to this affidavit, which

is incorporated herein by reference, is contraband, the fruits

of crime, things otherwise criminally possessed, or property

which is or has been used as the means of committing the

foregoing offenses.

43. Your Affiant, therefore, respectfully requests that

the attached warrant be issued authorizing the search of the

residence listed in Attachment A and the seizure of items listed

in Attachment B.

44.  I assert that public disclosure of the existence of this search warrant affidavit and all accompanying materials at this juncture could jeopardize the government's ongoing investigation in this case and therefore I request this affidavit and all accompanying material be sealed until further order of this Court.  FURTHER AFFIANT SAYETH NOT.

_____
Special Agent Julia Schulte Hanish
Federal Bureau of Investigation


SWORN TO AND SUBSCRIBED BEFORE ME
THIS 20 DAY OF January, 2012.

_____
Hon.
United States Magistrate Judge
Eastern District of North Carolina


Robert B. Jones, Jr.
US Magistrate Judge

25

Case 7:12-mj-01010-RJ   Document 1   Filed 01/23/12   Page 26 of 31

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The office of NEVINE ELSHIEKH located at the STERLING MONTESSORI ACADEMY, **202 TREYBROOKE DRIVE, MORRISVILLE, NORTH CAROLINA.** STERLING MONTESSORI ACADEMY is located at the corner of Treybrooke Drive and Town Hall Drive in Morrisville, North Carolina. Per the classroom map on the STERLING MONETSSORI website, NEVINE ELSHIEKH's office is located in the C-Building between rooms C-12 and C-14. Per the staff listing on the STERLING MONETSSORI website, NEVINE ELSHIEKH's office is located in room C-13.

A1

## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED AND SEARCHED

1.  Computer Hardware: Computer(s), computer hardware, cellular telephones, software, related documentation, passwords, data security devices (as described below), videotapes, video recording devices, video recording players, monitors and or televisions, and data were instrumentalities of and will contain evidence related to this crime.  The following definitions apply to the terms as set out in this affidavit and attachment:

    a.  Computer Hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Hardware includes any data-processing devices (including but not limited to central processing units; internal and peripheral storage devices such as fixed or removable hard drives, floppy diskettes, CDs or DVDs, USB flash drives, or other memory in any form.); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or

B1

parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

b. <u>Computer Software</u> is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

c. <u>Documentation</u> Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

d. <u>Passwords and Data Security Devices</u> are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software

B2

of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

2. Any and all notes, documents, records, or correspondence pertaining to HYSEN SHERIFI, SHKUMBIN SHERIFI, photographs, finances, pawn shops, raising money, research related to witnesses/inmates/agents, associations between SHKUMBIN SHERIFI, HYSEN SHERIFI and NEVINE ELSHIEKH, and financial institutions or representatives, locations, plans for and collection of funds, and co-conspirators yet known.

3. Any and all diaries, address books, names, and lists of names and addresses of individuals who may have been contacted by use of the computer, telephone or other means.

4. Any and all correspondence identifying persons transmitting, through interstate commerce, including by United States Mails or by computer, information related to this investigation.

5. Any and all records, documents, invoices and materials that concern any accounts with an electronic service provider

B3

that may have been used.

6.   Any and all documents, records, or correspondence pertaining to raising funds, Selling items or withdrawing funds.

7.   Any of the items described in paragraphs 1 through 6 above which are stored in the form of magnetic, optical or electronic coding on computer media, or on media capable of being read by a computer with the aid of computer-related equipment, including floppy diskettes, fixed or removable hard disks, CDs or DVDs, USB flash drives, or other memory in any form.

All of the above constitutes evidence, fruits, and instrumentalities of violations of Title 18 U.S.C. § 1958, a murder for hire conspiracy.

B4